O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OAKLEY, INC., and JAMES JANNARD,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>SEAN McWILLIAMS,<br><br>　　　　　Defendant.<br>_____ | Case No. CV 09-07666 DDP (RNBx)<br><br>**ORDER DENYING IN PART PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION**<br><br>[Docket No. 90] |

　　　Presently before the court is Plaintiffs' Motion for Permanent Injunction and Dismissal Following Summary Judgment ("Motion"). Having reviewed the parties' moving papers and heard oral argument, the court denies Plaintiffs' request to enjoin Defendant's speech and adopts the following Order. The court addresses and grants Plaintiffs' request to enjoin Defendant's conduct <u>not</u> involving speech in a separate Order.

**I.　BACKGROUND**

　　　Prior to 2006, Defendant Sean McWilliams ("McWilliams") worked as a consultant for a sunglasses company. In 2006, Plaintiff Oakley, Inc. ("Oakley") acquired the company. At the time, Oakley

and its founder, Plaintiff James Jannard ("Jannard"), had no knowledge or awareness of McWilliams.  McWilliams, however, soon began sending harassing emails to Oakley and Jannard's employees, associates, business partners, and industry personnel.  McWilliams claims that he also sent emails to law enforcement agencies, such as the Department of Justice and the Federal Bureau of Investigations.

In the emails, McWilliams makes statements attacking Plaintiffs' character and accusing them of criminal activity. McWilliams accuses Oakley of sponsoring charity fraud, being part of a price fixing cartel, and hiring "Blackwater thugs" to intimidate him.  McWilliams accuses Jannard of being a criminal and cheating on his wife.  Some of the emails include pornographic images of McWilliams, which he claims Oakley and Jannard created. According to Plaintiffs, McWilliams also uses various email accounts to represent himself as Jannard, Oakley, or other industry actors.  In at least one instance, McWilliams allegedly pretended to be Jannard posing as McWilliams, then made death threats to the President of the United States.

In its prior Summary Judgment Order, the court found that McWilliams intentionally published false facts that damaged Plaintiffs' character and reputation.  The court also found that Plaintiffs were not public figures and rejected McWilliams' claim that the statements were privileged.  Plaintiffs still have pending claims against McWilliams for fraud, publication of facts placing in false light, and intentional infliction of emotional distress.

The court has already held and reiterates that there is no evidence to support McWilliams' statements, which appear to arise from mental illness.

**II. DISCUSSION**

Plaintiffs now seek a permanent injunction of McWilliams' speech. Plaintiffs state that they have identified statements that the court has already found libelous, and ask the court to enjoin McWilliams from repeating these defamatory statements. Specifically, Plaintiffs' seek to enjoin McWilliams from:

> making the following defamatory statements about Plaintiffs, their parent, subsidiary, and affiliated companies or brands to any persons other than governmental officials with relevant enforcement responsibility: Jannard is a criminal; Jannard is an adulterer or cheated on his wife; Plaintiffs profited from proceeds generated from charity fraud; Plaintiffs (either directly or through agents) made death threats to McWilliams or his family; Plaintiffs created and/or sent pornography to or involving McWilliams; Plaintiffs engaged in intimidation tactics targeting McWilliams to secure a merger between Oakley and Luxottica; Plaintiffs sent thugs, Blackwater operatives, or military special forces to intimidate McWilliams; Plaintiffs hacked McWilliams' email account; Plaintiffs sent death threats, as McWilliams, to the White House; Plaintiffs have offered sums of money to McWilliams to remain quiet; Plaintiffs are war profiteers; Plaintiffs ignored corporate governance; Plaintiffs engaged in predatory surveillance.

Plaintiffs contend that the requested injunction of McWilliams' speech is narrowly tailored and therefore constitutional, pursuant to the California Supreme Court's decision in <u>Balboa Island Village Inn, Inc. v. Lemen</u>, 156 P.3d 339 (Cal. 2007).

**A. Legal Standard**

For any permanent injunction, the moving party must show: "(1) that is has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

3

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).

### B. Analysis

This case requires the court to determine whether it should issue an injunction against speech that the court has held to be defamatory. The traditional answer and the best answer is no. This court likewise so rules.

The court is mindful that vile, hurtful speech, such as that published by McWilliams here, has the capacity to cause real and significant injury. Nonetheless, the traditional and bright-line rule is founded on the idea that the private harm suffered by victims of the speech is a lesser harm than the harm that would be done to our constitutional traditions if courts were to carve out exceptions to the traditional rule and enjoin speech.

The reasons for the traditional rule are well set forth by Dean Erwin Chemerinsky in Injunctions in Defamation Cases, 57 Syracuse L. Rev. 157 (2007). The reasons for rejecting a bright-line rule are well set forth by a majority of the California Supreme Court in Balboa, 156 P.3d 339. The court therefore limits its analysis to quoting key arguments of both sides and offering observations.

#### 1. Presumptively Unconstitutional Prior Restraints

Injunctions against any speech, even libel, constitute prior restraints: they "prevent[] speech before it occurs," by requiring court permission before that speech can be repeated. Chemerinsky,

4

supra, at 163; see also Balboa, 156 P.3d at 355 (Kennard, J., concurring and dissenting) ("A prohibition targeting speech that has not yet occurred is a prior restraint." (citing Alexander v. United States, 509 U.S. 554, 550 (1993), and Tory v. Cochran, 544 U.S. 734, 736 (2005)).

Such prior restraints are "presumptively unconstitutional," and a "heavy burden of justification rests on anyone seeking a prior restraint on the right of free speech." Balboa, 156 P.3d at 355 (Kennard, J., concurring and dissenting) (citing Org. for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971), Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 558 (1975), and Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963)).  Indeed, injunctions against speech were not permissible in defamation cases under early English and American common law, and the Supreme Court has never departed from this precedent.[1]  See Chemerinsky, supra, at 167.

---

[1] Because Respondent Johnie Cochran passed away during litigation, the Supreme Court declined to resolve the question of whether "the First Amendment forbids the issuance of a permanent injunction in a defamation case, at least when the plaintiff is a public figure."  Tory, 544 U.S. at 736.  The Court has allowed injunctions with regard to obscene material, but there is good reason to distinguish this line of precedent.  See Balboa 156 P.3d at 363 (Werdegar, J., concurring and dissenting) ("We need not here decide whether the court's approval of these remedial measures aimed at curbing obscene speech is a function of the unique history of the regulation of obscene speech or the somewhat unique commercial and financial incentives connected to such speech.  It is enough to conclude that cases addressing the problem of obscene speech are not broadly applicable to all other forms of unprotected speech and thus provide no direct analogy to the question of the permissible remedies for defamation.").  There is also good reason to distinguish the Supreme Court's decision upholding a prior restraint in Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376 (1973).  Under the unique circumstances there, "the challenged advertising lost any First Amendment protection because it violated a municipal ordinance prohibiting sex-based discrimination."  Balboa, 156 P.3d at 364 (Werdegar, J., concurring and dissenting) (internal quotation marks omitted); see (continued...)

Further, in the infrequent instances where other courts have upheld injunctions of defamatory speech, there have usually been unique and extenuating circumstances, and vigorous dissents. See, e.g., San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters, 125 F.3d 1230, 1238-39 (9th Cir. 1997) ("We emphasize the narrowness of our decision.  The Union displayed a banner in front of the Hospital that included a prominent declaratory statement of fact which was so misleading as to be fraudulent."); id. at 1240 (Kozinski, J., dissenting) ("From bad to worse: Not only is this the first case to affirm a labor injunction, it is the first ever (so far as I am aware) to uphold a preliminary injunction against speech covered by [New York Times v. Sullivan, 376 U.S. 254 (1964)]."); Aquilar, 980 P.2d at 875 (Werdegar, J., concurring) ("Balancing [defendant's] First Amendment free speech rights with the equally weighty right of plaintiffs to be let alone at their jobsite, free of racial discrimination, I find the several factors coalescing in this case - speech occurring in the workplace, an unwilling and captive audience, a compelling state interest in eradicating racial discrimination, and ample alternative speech venues for the speaker - support the conclusion that the injunction, if sufficiently narrowed on remand to apply to the workplace only, will pass constitutional muster."); id. at 893 (Brown, J., dissenting) ("I can think of no circumstance in which this court has brushed aside such an important constitutional

---

[1](...continued)
also Aquilar v. Avis Rent A Car System, Inc., 980 P.2d 846, 879 (Cal. 1999) (Mosk, J., dissenting) ("[In Pittsburgh], the United States Supreme Court addressed the constitutionality of a restriction on commercial speech in support of an illegal commercial activity.").

protection as the right to free speech on the basis of so little analysis or authority."); Martin v. Reynolds Metals Co., 224 F. Supp. 978, 984 (D. Or. 1963) ("Unlike similar cases where equitable relief was denied, the court's injunction in this case would be both easy to carry out and easy to enforce - take down the sign, cease and desist until the claim is appropriately adjudicated.").

### 2. Ineffective or Overbroad

The injunction here, like injunctions against defamation in general, would also be ineffective, overbroad, or both. The injunction could "be limited to the exact communication already found to be defamatory," but it would then be "useless because a defendant [could] avoid its restrictions by making the same point using different words." Chemerinsky, supra, at 171. Here, for instance, Plaintiffs seek to enjoin McWilliams from stating that Plaintiffs "sent thugs, Blackwater operatives, or military special forces to intimidate him." But this injunction would be worthless if McWilliams could instead simply claim that Plaintiffs had hired the mafia or a street gang to threaten him. Such a narrowly tailored injunction would therefore fail to achieve its purpose of stopping the defendant's defamatory statements.

In addition, even an injunction limited to precise words is troubling because each of the elements of defamation may not be satisfied in the future. Id.; see also Balboa, 156 P.3d at 356 (Kennard, J., concurring and dissenting) ("A statement previously adjudged to be defamatory, and thus not protected by the First Amendment, may, when spoken in the future at a particular time and in a particular context, not be defamatory for a number of reasons, and thus be entitled to constitutional protection."). For

7

instance, a "statement that was false may become true later in time." Chemerinsky, supra, at 171. Or, a plaintiff might become a public figure, rendering certain statements privileged. Given such changed circumstances, a defendant would either have to: 1) muzzle his or her now lawful speech, while seeking and awaiting the court's permission to modify the injunction; or 2) speak freely, but risk potentially severe consequences if the court were to disagree about the lawfulness of the speech. See Balboa, 156 P.3d at 357 n.1 (Kennard, J., concurring and dissenting) ("To speak truthfully in violation of the injunction, [the defendant] must be willing to be cited for contempt, hauled into court, and face possible incarceration and fines. How many will be bold enough to run those risks?").

The only alternative to such an inadequate and still problematic injunction would be for the court to "reach more broadly and [also] restrain speech that . . . has [never been] determined to be libelous." Chemerinsky, supra, at 171. The court might, for instance, enjoin not only the specific statements at issue, but all similar ones. Although perhaps more effective, such an injunction would necessarily be overbroad: "An injunction that reaches more broadly than the exact words already held to be libelous is overbroad for the very reason that it restrains communication before [any] determination of whether it is or is not protected by the First Amendment. Because it delays communication that may be non-defamatory and protected by the First Amendment, it is the essence of a prior restraint." Id. at 172.

Moreover, a "similar statement" standard would require a court enforcing the injunction to continuously decide whether new

statements by a persistent defendant were sufficiently similar. If a court enjoined the word "thief," would related words like pilferer, looter, pillager, plunderer, poacher, and rustler also support the finding of willfulness necessary to hold the speaker in contempt? How about bandit? Pirate? What about phrases, e.g., "she was in the habit of converting other people's property to her own property?" Or further into abstraction, "she may take liberties with your property" or "count your silverware after she leaves your home?" See id. at 173 ("The richness of the English language and the myriad ways of expressing any thought means that the only effective way to enjoin defamation would be . . . to keep the defendant from ever uttering another word about the plaintiff.").

The endless game of synonyms and equivalents would therefore put courts in the problematic role of being "perpetual censors . . . continually deciding what speech is allowed and what is prohibited." Id. at 171; cf. Balboa, 156 P.3d at 356 (Kennard, J., concurring and dissenting) ("Subtle differences in wording can make it exceptionally difficult to determine whether a particular utterance falls within an injunction's prohibition."). And because a sufficiently distinct statement might not be defamatory, defendants could again face the problematic choice of restraining their potentially lawful speech while they seek court approval or risking being held in contempt.

### 3. Other Considerations

The court also has to be mindful of the ultimate outcome of this case. McWilliams would likely disobey any injunction of his

9

speech.[2] Plaintiffs would then likely ask the court to hold McWilliams in contempt and incarcerate him. McWilliams could still publish defamatory statements from jail, through letters or additional pleadings. His letters and pleadings could be censored by his jailers, but the jailers would then be placed in the position of adjudging what speech is impermissible. Thus, unless we are prepared to tolerate placing those that continue to defame in custodial isolation, injunctions against speech are unlikely to have the desired result.

Finally, the court notes that Plaintiffs have not yet sought money damages in order to potentially curtail McWilliams' defamatory statements without impinging on the First Amendment. But even if money damages failed to deter McWilliams, the court would not compromise the First Amendment with a prior restraint. As a United States Circuit Court explained over a century ago: "The wrongs and injury, which often occur from lack of preventive means to suppress slander, are parts of the price which the people, by their organic law, have declared it is better to pay, than to encounter the evils which might result if the courts were allowed to take the alleged slanderer or libeler by the throat, in

---

[2] In his Opposition to this Motion, McWilliams reiterates the claims that this court has found libelous. For instance, McWilliams insists that he is living abroad and cannot return to the United States, because of "repeated[] threats by Oakley private investigators." (Opp. at 4.) Suggesting that McWilliams may truly believe these claims, he also continues to request the assistance of various law enforcement agencies. (Id. at 5.) Moreover, McWilliams expressly states that: "A permanent injunction would never stop [him] from speaking the truth. [The o]nly way [he] would stop speaking the truth in this matter . . . is when civil redress/satisfaction is had . . . to compensate him for the heinous ordeal he was made to suffer through." (Id. at 8.).

advance." Citizens' Light, Heat & Power Co. v. Montgomery Light & Water Power Co., 171 F. 553, 556 (C.C.M.D. Ala. 1909).

**III. CONCLUSION**

> It, of course, is difficult to defend any absolute position, even this one that injunctions never should be permitted in defamation cases. But it seems less extreme if it is remembered that never in the 216 year history of the First Amendment has the Supreme Court found it necessary to uphold a prior restraint in a defamation case or any other. It is possible to imagine hypothetical situations where the absence of an injunctive remedy is troubling, but the law of the First Amendment should not be based on such as possibilities.

Chemerinsky, supra, at 172-73; see also Winterbottom v. Wright, 152 Eng. Rep. 402, 405-06 (1842) ("This is one of those unfortunate cases . . . in which, it is, no doubt, a hardship upon the plaintiff to be without a remedy but by that consideration we ought not to be influenced. Hard cases, it has frequently been observed, are apt to introduce bad law.").

Accordingly, this court declines to depart from the wisdom of precedent, and reaffirms the longstanding rule that injunctions of speech in defamation cases are impermissible under the First Amendment. The court therefore DENIES Plaintiffs' Motion for a Permanent Injunction with respect to Defendant's speech.

IT IS SO ORDERED.

Dated: July 20, 2012

DEAN D. PREGERSON
United States District Judge

11