1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NO JS-6

**OAKLEY, INC.**, a Washington
corporation, and **JAMES JANNARD**,
an individual,

       Plaintiffs,

   vs.

**SEAN MCWILLIAMS**, an individual,

       Defendant.

Case No.: CV 09-07666 DDP (RNBx)

**FINDINGS OF
FACT AND CONCLUSIONS
OF LAW**

Courtroom 3, 2nd Floor
Hon. Dean D. Pregerson

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

    1.    Prior to 2006, Sean McWilliams ("McWilliams") was hired as a consultant for Oliver Peoples, a sunglass company. (Complaint ¶ 8) As a consultant, McWilliams provided Oliver Peoples with various product samples. In 2006, Oakley, Inc. ("Oakley") acquired Oliver Peoples. Soon after the acquisition of Oliver Peoples by Oakley, personnel from Oliver Peoples began receiving harassing emails from McWilliams, some of which alleged

1   McWilliams had sexual relations with an employee of Oliver Peoples.

2   McWilliams does not dispute that he sent these emails. (Answer ¶ 13)

3       2.      For a short period time McWilliams ceased sending emails to

4   Oliver Peoples and Oakley staff. However, in June 2007, a proposal was

5   publicly announced for Oakley to be acquired by Luxottica Group S.p.A.

6   ("Luxottica"), and McWilliams resumed sending harassing emails to Oakley,

7   Oliver Peoples, Luxottica and innumerable other third parties defaming Oakley,

8   Oliver Peoples, and James Jannard (the founder and majority owner of Oakley)

9   ("Jannard"). (Complaint ¶¶ 16-23)

10      3.      The emails contained harassing statements; pornographic images of

11  McWilliams, which he claims were generated by Oakley and Jannard;

12  statements attacking the character of Jannard and Oakley; and accusations that

13  Jannard and Oakley were involved in price fixing, misleading investors, issuing

14  death threats, and a cover up. (Answer, Exs. 53-61) Specifically, McWilliams

15  accused Oakley of sponsoring charity fraud, being part of a price fixing cartel,

16  and hiring "Blackwater" thugs to intimidate him. (Answer ¶¶ 14-16)

17  McWilliams accused Jannard of being a "criminal" and of marital infidelity, as

18  well as encouraging Oakley's alleged activities. (Answer Exs. 114, 125-127)

19      4.      In his answer, "McWilliams admits documenting pornographic

20  images in only a handful of emails with law enforcement agencies, including the

21  DOJ. . . ." (Answer ¶ 22)

22      5.      The emails were sent to Jannard's employees, associates, business

23  partners, and industry personnel. (Jannard Decl., ¶¶ 8, 12, 23) McWilliams also

24  states that he sent emails to "third parties, including the Justice Department,

25  (FBI), State Dept., etc." (Answer ¶¶ 14, 22) Plaintiffs contend that McWilliams

26  has used more than 22 email addresses presenting himself as Jannard, Oakley,

27  Oliver Peoples or Luxottica. (Nelson Decl. Ex. 16) Several third party recipients

28  requested McWilliams stop sending emails due to "clogged inboxes."

-1-

6.      Both Jannard and Oakley claim that these emails have tarnished their reputation, caused serious embarrassment, and are not true. (Complaint ¶ 14) McWilliams "admits to sending emails [] to plaintiffs and third parties," but he "denies said emails contained untruthful allegations, harassing statements and otherwise discriminatory racist and hateful communications." (Answer ¶ 22)

7.      On October 22, 2009, Plaintiffs filed the present suit against Defendant with claims for libel per se, fraud, publication of facts placing in false light and intentional infliction of emotional distress. (Dkt. No. 1) Defendant answered the complaint and filed his own counterclaims alleging intentional infliction of emotional distress on April 9, 2010. (Dkt. No. 23) After conducting discovery, Plaintiffs moved for summary judgment on their claim of libel per se and Defendant's counterclaim.

8.      On September 16, 2011, this Court granted Plaintiffs' motions for summary judgment. The Court held that Defendant's emails constituted libel per se where the Defendant intentionally sent derogatory emails to third parties, declaring that Oakley and Jannard were guilty of criminal and immoral activity, which subsequently damaged the character and reputation of Plaintiffs. (Dkt. No. 87) The Court also granted Plaintiffs' motion for summary judgment on Defendant's counterclaim for intentional infliction of emotional distress and dismissed the Defendant's counterclaim with prejudice. (*Id.*)

9.      Following the ruling on Plaintiffs' motion for summary judgment, Plaintiffs filed a motion for a permanent injunction on January 18, 2012, which was granted in part and denied in part on July 20, 2012.

10.     Trial was scheduled to commence on Plaintiffs remaining causes of action on September 25, 2012. On September 24, 2012, the Court held a final pre-trial conference with the parties. At that time, Defendant appeared telephonically from China, where he resides. During the appearance, Defendant

indicated that he would not appear for trial on the next day because he was unwilling to travel from China. (Dkt. No. 119) Accordingly, the Court ordered that default be entered against the Defendant and his answer stricken. (*Id.*)

11.    Also during the pre-trial conference Plaintiffs indicated that they were willing to dismiss their second through fourth causes of action for fraud, publication of facts placing in false light and intentional infliction of emotional distress, respectively, and offering to present evidence to prove up damages on its first claim for libel per se. Accordingly, the Court commenced the trial on that day for purposes of proving up damages on its libel claim. (Dkt. No. 121)

12.    The only remaining claim is Plaintiffs' first claim for libel, on which the Defendant has already been found liable. Where the Court has also previously issued a permanent injunction restraining certain acts by the Defendant, the only remaining issue is damages. The Court enters the following findings of fact and conclusions of law in support of damages on Plaintiffs' claim of libel against the Defendant.

## I.  LEGAL STANDARDS

13.    Where Defendant is in default, evidence of the amount of damages may be presented by way of declarations, provided that the claimed judgment is unliquidated. Fed. R. Civ. Proc. 55-2; Local Rule 55-2. The Defendant must be provided notice of the amount claimed as damages, and given the opportunity to submit declarations in opposition to the request for damages. *Id.*

14.    In this case, when Defendant refused to comply with the Court's order to appear for trial, he was advised of the amount of Plaintiffs' claim for damages. Further, Plaintiffs filed a memorandum advising of the amount of damages sought, including evidence to support such damages. (Dkt. No. 122) The Court ordered Defendant to file any evidence opposing damages, and Defendant failed to do so.

///

15.     In submitting declaratory evidence, such evidence must still meet the authenticity and evidentiary threshold standards.   Plaintiffs submit three declarations to support their damage claim. The first is a declaration of Gregory K. Nelson, counsel for Plaintiffs. This declaration includes (1) a DVD of numerous emails sent by Defendant to third parties between January 23, 2009 and June 2012, and (2) an accounting of attorneys' fees incurred by both the Plaintiffs. The next declaration is the declaration of Brad Haydon, which recounts his efforts to extract the number (and identity) of unique email addresses to whom Defendant sent the defamatory emails and how many times each email address received one of the emails. The final declaration is from Jannard and includes an invoice for investigative fees incurred by him in 2010-2012 related to this matter. The Court finds that all the evidence presented is sufficiently authenticated and satisfies other evidentiary standards of truthfulness to be admitted in this proceeding.

16.     One who publishes false and libelous statements is liable for general, special and punitive (exemplary damages). Each repetition of the defamatory statements is a separate publication, giving rise to a separate cause of action. *Shively v. Bozanich*, 31 Cal. 4th 1230, 1243, 80 P.3d 676 (2003); *Prosser, Torts 2nd Ed.*, p. 787.  General damages include damages for shame, loss of reputation, mortification, and hurt feelings; special damages cover money expended as a result of the alleged libel; and punitive, or exemplary damages, are awarded in the discretion of the court or jury "in addition to general and special damages for the sake of example and by way of punishing a defendant who has made the publication or broadcast with actual malice." *Cal. Civil Code* § 48a(4). "Actual malice" is "that state of mind arising from hatred or ill will toward the plaintiff."    *Id.* Elsewhere, malice has been defined as conduct "intended by the defendant to cause injury to the plaintiff" or "despicable conduct which is carried on by the defendant with a willful and

conscious disregard of the rights or safety of others." *Cal. Civil Code* § 3294(c)(1); *see also College Hospital, Inc. v. Superior Court,* 8 Cal. 4th 704, 721 (1994).

## II. <u>FINDINGS</u>

### A.   <u>General Damages</u>

17.   Plaintiffs are entitled to an award of general damages arising from the shame, mortification and hurt feelings caused by Defendant's insidious email barrage.   Where defamatory language is libel per see, because it is defamatory on its face, "damage to plaintiff's reputation is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages." *Contento v. Mitchell,* 28 Cal. App. 3d 356, 358, 140 Cal. Rptr. 591 (1972), Publications are libelous per se if there is no need to introduce explanatory matter. *Cal Civ. Code* § 45a; *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1010 (9th Cir. 2001). The Court has already concluded that Defendant's emails constitute libel per se, and thus no extrinsic evidence of actual damages is necessary.

18.   Between January 23, 2009 and June 2012, Defendant sent over a million defamatory emails. Defendant's libelous emails were sent to at least 2,143 unique email addresses, or recipients. (Haydon Decl., ¶ 5 and Ex. 1) These recipients received a total of 1,080,783 emails from McWilliams. (*Id.*) Each sending of a defamatory statement is a separate instance and results in separate damage. *Shively*, 31 Cal. 4th at 1243. McWilliams sent 1,080,783 defamatory emails. Plaintiffs' reputation and injury are presumed and established; they need not set forth any specific proof of actual damages. The Court awards general damages of One Dollar ($1.00) per email, or a total of $1,080,783 in favor of the Plaintiffs.

///

///

**B.     Special Damages**

19.     Plaintiffs are also entitled to an award of special damages meant to cover expenses incurred exclusively because of Defendant's actions. Here, Oakley and Jannard have both incurred attorneys fees and Jannard has also incurred investigate fees.

20.     Oakley incurred attorneys' fees of $28,740, which should be awarded to Oakley against McWilliams as special damages.  (Nelson Decl., ¶ 4)

21.     Fearful of his safety, as well as his reputation, Jannard hired an investigative firm in the United States to monitor McWilliams' posts beginning in 2010 and report to counsel.  Costs associated with these monitoring efforts amounted to $36,000 between 2010 and 2012.   (Jannard Decl., Ex. 1) Additionally, Jannard also incurred $15,675 in legal fees associated with the prosecution of this matter. Jannard should be awarded this total amount of $51,675 as special damages.

**C.     Punitive Damages**

22.     Plaintiffs request that the Court award punitive damages of $100,000 to each Plaintiff to deter the Defendant. California courts traditionally look to three factors in assessing punitive damages: (1) the reprehensibility of the conduct; (2) the amount of punitive damages to have a deterent effect on the Defendant; and (3) a reasonable relationship between the punitive damages and the injury actually suffered. *BAJI* 14.71 and 14.72.2; *Neal v. Farmers Ins. Exchange,* 21 Cal. 3d 910, 928, 148Cal. Rptr. 389, 399 (1978).

23.     Punitive damages must also conform with federal and state due process norms. To do so, the Court should consider punitive damages in light of "guideposts" articulated by the United States and California Supreme Courts.  In *State Farm Mut. Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408, the United States Supreme Court weighed punitive damages by looking "to the nature and effects of the defendants' tortious conduct and the state's treatment of

comparable conduct in other contexts. As articulated in *State Farm,* the constitutional 'guideposts' for reviewing courts are: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'" *See also BMW of North America v. Gore,* 517 U.S. 559, 575 (1996). This analysis has been similarly applied by the California Supreme Court is *Simon v. San Paolo U.S. Holding Co., Inc.,* 35 Cal. 4th 1159, 113 P.3d 63 (2005) and *Johnson v. Ford Motor Co.,* 35 Cal. 4th 1191, 113 P.3d 82 (2005).

24.     The degree of reprehensibility is said to be the most important guide in the analysis. *State Farm*, 538 U.S. at 419. The following circumstances should be weighed in considering the degree of reprehensibility: whether the harm caused was physical as opposed to economic; whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; whether the target of the misconduct was financially vulnerable; whether the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm,* 538 U.S. at 419; *see also Simon,* 35 Cal. 4th at 1180.

25.     Jannard and Oakley have been the victims of years of cyber-harassment and abuse by the Defendant.  Jannard, in particular, has been called a criminal, adulterer, and thief by McWilliams. These rants have been sent to friends, employees, business associates, competitors, government agencies, newspapers, and other unwitting victims.  At times, the emails have been threatening. In today's world of random violence, the threats have been worrisome, indeed so much so that Jannard hired an investigator in 2010 to monitor McWilliams' posts. Though the alleged injury is more economic than physical, namely an injury to reputation, the excessive and constant barrage is

1    much more than normal. This is not a case of one publication. Instead, since

2    2009, McWilliams has sent over one million emails of his lurid accusations.

3        26.   McWilliams has shown a complete disregard to the well-being of

4    the Plaintiffs. Indeed, as admitted in his answer, McWilliams has indicated that

5    he will not stop. His actions are clear – he does not care what injury his acts

6    cause to the reputation of the Plaintiffs.

7        27.   The Court does not find that either of the Plaintiffs were financially

8    vulnerable at the time of McWilliams' cyber-attacks.

9        28.   McWilliams' acts have known no apparent bounds.  His libelous

10   emails have been ongoing since 2007. From January 2009 through the present,

11   counsel has tabulated in excess of 3,925 emails sent by McWilliams to third

12   parties. Hundreds more were sent in the year and a half prior to that date.  All

13   the emails contain the same threats, accusations, and embarrassing innuendos.

14       29.   McWilliams' acts have evinced intentional malice, trickery and

15   deceit. As noted on summary judgment, McWilliams has posed as Jannard to

16   make threats to the President of the United States. McWilliams has assumed

17   email addresses bearing the names of Jannard and Oakley, and their affiliates.

18   His acts clearly took aim at the Plaintiffs and constitute a scheme to embarrass,

19   harass, and ruin their reputations.

20       30.   In sum, as least four of the factors weigh in favor of finding an

21   above normal degree of reprehensibility in the view of other defamation cases.

22   The Defendant has attacked the reputation and embarrassed both Plaintiffs for

23   years. The facts here clearly show a high degree of reprehensibility by the

24   Defendant in his actions.

25       31.   Although there is no direct evidence of McWilliams' financial

26   condition, it is understood that he claims low income status. He represented that

27   he lives in China and has little money. While his financial condition should

28   certainly be considered, *see Simon*, 35 Cal. 4th at 1184-85, the reprehensibility

1    of his acts is high and outweighs this factor.

2         32.   In assessing due process of an award, courts should consider

3    comparable civil penalties. California's legislature has approved an award of

4    three-times (treble) damages in several instances.  For example, antitrust

5    violations under the Cartwright Act mandates treble damages. *Cal. Bus. & Prof.*

6    *Code* § 16750. Certain fraudulent acts, such as deceptive practices causing

7    economic injury disabled persons or seniors (*Id.* § 3345), fraudulent evictions in

8    municipalities with rent controls (*Id.* § 1947.10), and antidiscrimination

9    provisions of the Unruh Civil Rights Act (§ 52(a)) all authorizes treble damages.

10   These statutes all evince fraud and/or injury to reputation, which is at the root of

11   the Defendant's reprehensible actions in this case.

12        33.   Plaintiffs request that the Court award punitive damages equal to

13   $100,000 to each of them. This amount is much less than the standard in

14   California. Typically, ratios of 3 or 4 to 1 are considered reasonable and to

15   satisfy due process. *Simon*, 35 Cal. 4th at 182.  Punitive damages "exceeding a

16   single-digit ratio between punitive and compensatory damages, to a significant

17   degree" are not likely to satisfy due process. *State Farm*, 538 U.S. at 425. In

18   *Simon*, 35 Cal. 4th 1159, the Supreme Court reduced the jury's punitive damages

19   award to $50,000, which was ten-times the compensatory award for promissory

20   fraud ($5,000). The Court stated that "[t]he nature and size of the compensatory

21   award here thus militates for a maximum award at the top of, but not

22   significantly beyond, the single-digit range." *Id.* at 1189. An award of $100,000

23   to each Plaintiff as punitive damages satisfies due process, as this award is much

24   less than the damage award.

25        34.   Plaintiffs are seeking a much smaller award than they might

26   otherwise be entitled to as punitive damages. Indeed, the amount of $100,000

27   each ($200,000) total is less than the actual damage award. It is clear that

28   exemplary damages are warranted in this case, and the Court awards punitive

1   damages in favor of each Plaintiff in the amount of $100,000.

## III.  CONCLUSION

3        35.    The Court hereby awards damages to the Plaintiffs in the amount of

4   in the amount of $1,080,783.00.

5        36.    The Court hereby awards $28,740 as special damages to Oakley

6   and $51,675 as special damages to Jannard.

7        37.    The Court finds that punitive damages are merited in this case, and

8   awards $100,000 as punitive damages to each of the Plaintiffs, for a total of

9   $200,000.

10       38.    All remaining claims, counterclaims, and defenses are dismissed

11  with prejudice.

13  IT IS SO ORDERED.

15  Dated: October 17, 2012

16                             UNITED STATES DISTRICT JUDGE